Brockenbrough, J.
The first question is as to the proper construction of the articles. Caleb Tait and Charles Deison were to unite with Edmund Tait in erecting mills on the land and stream of the latter; when built, they were to share equally the profits for seventeen years; at the end of which term, the mills were, if necessary, to be rebuilt at their equal and joint expense, and delivered to Edmund Tait; and he was then bound to refund to the other two, the two thirds of the whole expense incurred in rebuilding them, and two *160 thirds of the expense of the original building. The parties did not provide for the event which subsequently occurred, of the destruction of the building by the flood. Soon after these articles were executed, Deison transferred all his interest in the subject to Caleb Tait. And after the destruction of the mill which was built, the two brothers were each bound to the other, to put up the buildings, and to have them there at the end of the seventeen years, then to be delivered into the exclusive possession of Edmund Tait.
It seems to me, that, according to the plain meaning of these articles, the right of Caleb Tait to reimbursement of the two thirds of the expense incurred in erecting, and in renewing the buildings, did not attach till the end of the term; and not then, unless the buildings should be delivered to Edmund Tait, or unless Caleb being willing and offering to rebuild, should be prevented by Edmund from rebuilding. The object of Edmund was to have the mills built on his land, by the joint contribution of the other two and himself, to have a partnership in the milling business for the specified term, and, at the end of it, to have the exclusive interest and possession of the mills in himself. As he was then to have such exclusive possession, he was bound by the contract to pay to his brother the two thirds of the whole expense of erecting, and re-erecting them. But if, from any cause, the exclusive possession of the mills should not be'given to him at the end of the term, why should he pay for more than his own share of the expense of the first, or any other erection ? In the event that the mills should be delivered to him at the end of the term, each party would be benefited according to the original intention, of the contracting parties; he would have his mills, and they would have their share of the price of erecting them. In the event of the destruction of the mills, and the abandonment of the intention- of rebuilding them, the loss of each would be equal: each would *161 lose the sum advanced for the erection. At the end of the term, Edmund would lose his own share of the expense of erection, and the advantage of the use of a mill in operation; Caleb would lose his share of the la-hour and materials employed in the erection. But if the articles are so construed, that Caleb shall be paid for his labour and materials, although the mills are not rebuilt, then the whole loss would fall on Edmund, the other sustaining no part of it. This would be unequal and unjust.
Although such is my construction of the articles, in which, it seems, 1 differ from my brethren, yet 1 am satisfied that it was competent for these parties, after the loss happened, to make a compromise, to construe the contract in their own way, and adjust the loss according to their own ideas of right. It appears that this was done. Edmund Tail agreed, by solemn instrument, to pay to Caleb the amount of his expenditures, when the same should be ascertained, within ten years from the time of the agreement. The bill alleges, that Caleb, after the loss, offered to proceed with the rebuilding, but that Edmund, being much discouraged by the loss, refused to proceed any further, and on thus abandoning the contract, promised to repay him his expenditures, and in compliance with that promise, executed the instrument of August 1814. The answer positively denies, that Edmund Tait refused to proceed with the building; and, on the contrary, avers, that Edmund required Caleb to go on with the buildings, which Caleb refused, except on inadmissible terms. There is some evidence to support this allegation of the answer, but I think it is not sufficient to outweigh the evidence of Edmund’s own solemn obligation, unless indeed that obligation can be impeached. This is attempted by the defendant; for, in his answer, he charges, that the bond was obtained by false and fraudulent misrepresentations ; but in the proof of this charge he has totally *162 failed; there is not the slightest evidence to prove that it was so procured. The bond then being unimpeached, I hold it to b.e satisfactory evidence to prove, either that Edmund construed the articles as imposing on him the duty of repaying to his brother his expenditures on the erection, or that he had determined to abandon the milling project, and would not permit the building to go on. In the first alternative, if he gave a wrong construction to the articles, as I suppose, he is still bound by his obligation, for it was founded on a mistake of the law, and not of the facts: in the other alternative, that of abandonment, he was clearly hable. I am, therefore, of opinion, that the decree should be reversed, and the cause remanded, for further proceedings.
Carr, J.
I differ entirely from the chancellor on the main points in the cause. It seems to me, that by the articles between the parties of January 1813, it was intended, that the partnership, as to joint profit, should commence with the grinding of the mills; the building and the expenses thereon incurred, were mere preparation for this. The land and mill seat.belonging to Edmund, the other parties were to share the profits with him for seventeen years, and then the concern was to cease; the property to remain with the owher, and the other partners to receive the moneys they had expended, whether in the original erection or subsequent rebuilding of the mills. The same, I presume, would have been the consequences, if the parties, before the end of the term, had at any time dissolved the partnership, without making a particular provision for them. A fresh swept away their mill house as soon as it was completed. This seems to have been an accident unprovided for in the articles. Whose should be the loss ? His, I think, who owned the property. Every man is the insurer of his own houses, unless he gets them insured. I do not think these articles made the partners the insurers. *163 The risk was one to which the mills were known to be liable, and no provision is made against it. This it seems to me is the fair construction of the contract. If when the house was destroyed, Edmund insisted on rebuilding, and a continuance of the adventure, and Caleb refused, an action for damages, or a bill for specific ex-ecutionj was the course. Neither of these was taken; but instead of this, the brothers agree to adjust the matter by abandoning the scheme, and Edmund executes to Caleb his obligation to repay him the amount of his expenditures on the mills, when the same are ascertained, within ten years. Herp, then, is to my mind, a clear construction given to the articles by the parties themselves, who must have understood, better than all the world besides, what they themselves meant in the contract; and unless this obligation be impeached in some way, I hold that no human tribunal can touch it. The answer states, that it was obtained by fraudulent contrivance and imposition, Caleb withholding the articles, and misrepresenting them to Edmund. This is a charge which would require strong proof to sustain it: The record furnishes none; not the slightest. We do not find even, that Caleb had possession of the articles; they seem to have been in the clerk’s office of the county court, equally accessible to both parties. This view of the case seems to me decisive. I think the decree should be reversed, and the cause remanded.
Cabell, J. concurred.
Tucker, P.
The appellee in this case, being the owner of a mill seat, entered into a contract with his brother, the appellant’s'intestate, and. another person, for the erection of mills and other water works. By this agreement, each party was to advance one third of the expenses of erection, and they were then to hold the property in partnership for seventeen years, receiving *164 equal portions of the profits. At the end of that period, the property was to be given up to the appellee, who was to refund to the other parties, all these advances for the original erection, or for any re-erection which might be rendered necessary; the parties distinctly engaging, that at the expiration of the term, if rebuilding should be necessary it should be done at their joint expense. In pursuance of this contract, one mill was erected, but it was swept off by a fresh within a short lime; which seems to have discouraged the parties, and to have suspended further operations. Caleb Tait, the intestate of the appellant, had bought out the interest of the third party Deison; and the appellee contends, and I think it is proved, that he refused to make advances for the rebuilding, except upon condition of receiving security to refund; a term which he certainly had no right to introduce into the contract. It is now contended, that he is not entitled to recover his advances for the original building, but that in consequence of the abandonment of the contract, he must now be considered as a partner in the original erection, absolutely bound for one third of the expenses, and without a right to reclamation, except for any excess he may have advanced, over and above his own proportion, and that of Deison whose interest he had bought out. I cannot perceive any foundation for this pretension.
It cannot be denied, that if Caleb Tait had strictly complied with his engagements, and had advanced two thirds of the funds for the rebuilding, he would, at the end of seventeen years, have been entitled to recover back not only those two thirds, but two thirds also of the expense of the original construction of the mill that was swept away; thus clearly shewing, that losses by flood or otherwise, were to fall upon Edmund Tait, the owner of the estate, and not upon the other partner; except that he would lose the profits of his adventure, and receive no interest on his advances for seventeen *165 years. Now, if tlxis was the character of the original contract, it surely cannot he contended, that, by a failure to fulfil it on the part of Caleb Tait, this whole character was changed, and he was made liable to bear a loss which never was contemplated to be borne by him. If he broke his contract, he was liable to the action of Edmund Tait, who might recover such damages as he could shew he had sustained; but it does not follow that, by the breach, he is to forfeit his right to recover back those advances, to which he would have had an unquestionable right, if he had fulfilled his contract. The ca.se is, in this regard, precisely within the principle of Pordage v. Cole, 1 Saund. 320. c. Lewis v. Weldon, 3 Rand. 71. and Bream v. Marsh, 4 Leigh 21. If it were otherwise,—if the recovery of the first advances was to depend upon the complete fulfilment of the engagement to make the further advance,—then the failure to the amount of one dollar, would exclude Caleb Tait from a right to recover back any thing; and thus, the penalty on him might be thousands of dollars, while the loss to Edmund Tait would have been only the loss of the use of one dollar. To avoid such flagrant injustice, these covenants would have been construed independent, even if they had been otherwise in form. But, in tru th, they are not dependant even in form; and if at the end of seventeen years, Caleb Tail had sued for his original advances, it would not have been necessary that he should have averred a fulfilment, of the contract for advances for the rebuilding of the mill. In this view of the case, it is obvious, that, whether the subsequent bond had been given by Edmund Tait or not, Caleb Tait would have been entitled to recover back his original advances. But this bond, which appears to me entirely free from the imputation of fraud or circumvention, has definitively settled the rights of the parties. The difference between them under the original articles, was terminated by it; Edmund Tail *166 agreeing to pay to Caleb the amount of his expendiS , , ■, , , , , . 1 tures on the milis (when the same should be ascertained) within ten years, without any stipulation for interest in the mean time. By this obligation, Edmund became no farther bound than he was before, except in so far as the repayment of the advances is accelerated by it. Of this acceleration, Edmund does not complain. He complains of being bound to pay at all. The motives for fixing upon ten years, we cannot penetrate, nor ’is it necessary. It was, probably, a compromise between the brothers, Edmund insisting on further advances, and Caleb refusing to make them without security. In this state of things, they seem to have abandoned the scheme, and to have fixed upon the terms of adjustment evidenced by the bond. It must, therefore, be respected as a settlement of their differences, and its terms must be enforced accordingly. At first, I doubted,- however, whether the bill was not prematurely filed, as the ten years had not expired at the commencement of the suit. But on reflection, I think the reasons assigned in the bill, and the terms of the bond, are sufficient to justify the proceeding. The bond contains an implied promise to account, at a period anterior to the expiration of the ten years, which may properly be enforced in equity.
Upon the whole, I am of opinion that the decree should be reversed, and the cause sent back for further proceedings.
Decree reversed, and cause remanded.